# Authority of the Department of the Interior to Provide Historic Preservation Grants to Historic Religious Properties Such as the Old North Church

The Establishment Clause does not bar the award of historic preservation grants to the Old North Church or to other active houses of worship that qualify for such assistance, and the section of the National Historic Preservation Act authorizing the provision of historic preservation assistance to religious properties listed on the National Register of Historic Places is constitutional.

April 30, 2003

MEMORANDUM OPINION FOR THE SOLICITOR
DEPARTMENT OF THE INTERIOR

You have asked us whether the Establishment Clause of the First Amendment permits the Department of the Interior ("DOI") to provide grants for preservation of historic structures that, although open to the general public, are also used for religious purposes. In the National Historic Preservation Act, Congress expressly provided that DOI's authority to award grants for the preservation of properties listed in the National Register of Historic Places, *see* 16 U.S.C. § 470a(e)(3) (2002), extends to grants "for the preservation, stabilization, restoration, or rehabilitation of religious properties listed in the National Register of Historic Places, provided that the purpose of the grant is secular, does not promote religion, and seeks to protect those qualities that are historically significant." *Id.* § 470a(e)(4). Accordingly, on September 27, 2002, the National Park Service ("Park Service") awarded such a grant to the Old North Church, where lanterns were hung on the eve of the Revolutionary War—"One, if by land, and two, if by sea"—signaling to Paul Revere whether the British were approaching by land or water. Shortly thereafter, however, the Park Service reversed its position, relying on a 1995 opinion of this Office advising that a reviewing court, applying then-current Establishment Clause precedent, would likely invalidate the provision of a historic preservation grant to an active church. *See Constitutionality of Awarding Historic Preservation Grants to Religious Properties*, 19 Op. O.L.C. 267 (1995) ("1995 Opinion"). You have asked whether the 1995 Opinion reflects our understanding of the law today. For the reasons set forth below, we conclude that the Establishment Clause does not bar the award of historic preservation grants to the Old North Church or other active houses of worship that qualify for such assistance, and that the section of the National Historic Preservation Act that authorizes the provision of historic preservation assistance to religious properties is constitutional.

## I.

## A.

Your request for advice involves the Save America's Treasures program ("Program"), which is administered by the Park Service working together with the States. The Program, established in 1998 pursuant to the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470–470x-6 (2000), provides matching grants for preservation of "the enduring symbols of American tradition that define us as a nation." *See* Letter for Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, from William G. Myers III, Solicitor, Department of the Interior, at 3 (Jan. 24, 2003) ("Myers Letter"); Department of the Interior and Related Agencies Appropriations Act, 2002, Pub. L. No. 107-63, 115 Stat. 414, 425 (2001). Matching Save America's Treasures grants are available for work on "nationally significant intellectual and cultural artifacts and nationally significant historic structures and sites." *FY 2002 Federal Save America's Treasures Grants—Guidelines and Application Instructions* at 1 ("Guidelines"), *available at* http://www.pcah.gov/sat/SAT2002.html. In a typical year, approximately 70 percent of the Save America's Treasures grants are awarded for the preservation of historic structures or sites, and 30 percent are awarded for museum and archival collections. Past grantees include Frank Lloyd Wright's Taliesin Estate in Spring Green, Wisconsin, the Star Spangled Banner at the Smithsonian Institute, Thomas Jefferson's papers at the Massachusetts Historical Society, and the ancient cliff dwellings of Mesa Verde National Park in Colorado. Myers Letter at 2. Funding for the Program is provided by the Historic Preservation Fund, which was created by the NHPA. *See* 16 U.S.C. § 470h.

Four types of entities, including both public and private institutions, are eligible to apply for Save America's Treasures grants: federal agencies that receive funding under DOI appropriations legislation; units of state and local government; federally recognized Indian tribes; and organizations that are tax-exempt under section 501(c)(3) of the Internal Revenue Code. Guidelines at 1. Representatives of the Park Service review and rank applications on the basis of extensive criteria, primarily related to historical significance.[1] Most important, as a "threshold criterion," the applicant must demonstrate the property's "national significance," as that term is defined by the Guidelines. *Id*. at 3.[2] Reduced to its essentials, this

---

[1] Representatives of the National Endowment for the Arts, the National Endowment for the Humanities, and the Institute for Museum and Library Services review applications for funding of museum and archival collections under the Program.

[2] "The quality of national significance is ascribed to . . . historic properties that possess exceptional value, or quality in illustrating or interpreting the intellectual and cultural heritage and the built environment of the United States, that possess a high degree of integrity and:

requires a showing that the property possesses "exceptional value or quality in illustrating or interpreting the intellectual and cultural heritage and the built environment of the United States," that it possesses "a high degree of integrity," and that it is associated with events, persons, ideas, or ideals that are especially significant in American history. *Id*. In addition, the property must have been either designated as a National Historic Landmark or listed as a place of "national significance" in the National Register of Historic Places ("National Register"), or be provisionally eligible for such designation or listing. *Id*. at 3–4.[3]

---

"That are associated with events that have made a significant contribution to, and are identified with, or that outstandingly represent the broad patterns of United States history and culture and from which an understanding and appreciation of those patterns may be gained; or,

"That are associated importantly with the lives of persons nationally significant in the United States history or culture; or,

"That represent great historic, cultural, artistic or scholarly ideas or ideals of the American people; or,

"That embody the distinguishing characteristics of a resource type

"that is exceptionally valuable for the study of a period or theme of United States history or culture; or

"that represents a significant, distinctive and exceptional entity whose components may lack individual distinction but that collectively form an entity of exceptional historical, artistic or cultural significance (e.g., an historic district with national significance), or

"that outstandingly commemorate or illustrate a way of life or culture; or,

"That have yielded or may be likely to yield information of major importance by revealing or by shedding light upon periods or themes of United States history or culture."

Guidelines at 3.

[3] To establish a historic structure's eligibility for the National Register, an applicant must first demonstrate the building's "significance in American history, architecture, archeology, engineering, and culture" in light of its "integrity of location, design, setting, materials, workmanship, feeling, and association." 36 C.F.R. § 60.4 (2002) ("*National Register criteria for evaluation*"). Eligibility for the National Register also requires that a building be one that:

(a) is "associated with events that have made a significant contribution to the broad patterns of our history";

(b) is "associated with the lives of persons significant in our past";

(c) "embod[ies] the distinctive characteristics of a type, period, or method of construction, or that represent[s] the work of a master, or that possess[es] high artistic values, or that represent[s] a significant and distinguishable entity whose components may lack individual distinction"; or

(d) "ha[s] yielded, or may be likely to yield, information important in prehistory or history."

*Id*. Nominations to the National Register may be made by the State Historic Preservation Office, by federal agencies, or jointly by state and federal authorities. *See id*. §§ 60.6, 60.9, 60.10. A property may be listed in the National Register for local, regional, or national significance, but a listing for national significance must satisfy more stringent criteria.

In addition to "national significance," applicants for Save America's Treasures grants must also demonstrate that the historic property is "threatened" or "endangered," or that it has an "urgent preservation and/or conservation need." Guidelines at 3. Moreover, the proposed project "must address the threat and must have educational, interpretive, or training value and a clear public benefit (for example, historic places open for visitation or collections available for public viewing or scholarly research)." *Id*. The project must be "feasible (i.e., able to be accomplished within the proposed activities, schedule and budget described in the application), and the applicant must demonstrate ability to complete the project and match the Federal funds." *Id*. Once a project has met the threshold criterion of "national significance," the threat to the structure amounts to 30 percent of its total

---

Designation as a National Historic Landmark requires satisfying more stringent criteria than those that must be satisfied for listing in the National Register. DOI regulations provide:

> The quality of national significance is ascribed to districts, sites, buildings, structures and objects that possess exceptional value or quality in illustrating or interpreting the heritage of the United States in history, architecture, archeology, engineering and culture and that possess a high degree of integrity of location, design, setting, materials, workmanship, feeling and association, and:
>
> > (1) That are associated with events that have made a significant contribution to, and are identified with, or that outstandingly represent, the broad national patterns of United States history and from which an understanding and appreciation of those patterns may be gained; or
> >
> > (2) That are associated importantly with the lives of persons nationally significant in the history of the United States; or
> >
> > (3) That represent some great idea or ideal of the American people; or
> >
> > (4) That embody the distinguishing characteristics of an architectural type specimen exceptionally valuable for a study of a period, style or method of construction, or that represent a significant, distinctive and exceptional entity whose components may lack individual distinction; or
> >
> > (5) That are composed of integral parts of the environment not sufficiently significant by reason of historical association or artistic merit to warrant individual recognition but collectively compose an entity of exceptional historical or artistic significance, or outstandingly commemorate or illustrate a way of life or culture; or
> >
> > (6) That have yielded or may be likely to yield information of major scientific importance by revealing new cultures, or by shedding light upon periods of occupation over large areas of the United States. Such sites are those which have yielded, or which may reasonably be expected to yield, data affecting theories, concepts and ideas to a major degree.

36 C.F.R. § 65.4(a) (2002). These evaluations, while "reflect[ing] both public perceptions and professional judgments," are "undertaken by professionals, including historians, architectural historians, archeologists and anthropologists familiar with the broad range of the nation's resources and historical themes." *Id*. § 65.4. "The final decision on whether a property possesses national significance," however, "is made by the Secretary on the basis of documentation including the comments and recommendations of the public who participate in the designation process." *Id*. In addition, a property's designation as a National Historic Landmark automatically results in its being listed in the National Register. *Id*. § 60.1(b).

evaluation score; how the project addresses the threat amounts to 30 percent of its score; the educational value of the project amounts to 10 percent of its score; and the applicant's ability to meet budget and secure the non-federal matching funds amounts to 30 percent of its score. *Id*. at 4.

After the Park Service completes its ranking of applicants, a Grants Selection Panel ("Panel") further reviews the ranked applications and recommends grantees to the Secretary of the Interior. Myers Letter at 2. The Panel comprises federal employees, selected by the Park Service, with professional expertise in fields such as history, preservation, conservation, archeology, and curatorship. *Id*. In order to insulate the panel members from external influence, DOI does not disclose their identity to the public. *Id*. If the Secretary agrees with the Panel's recommendations, the Park Service informs the applicants of the results. *Id*.[4]

Applicants that qualify for a grant under the substantive criteria discussed above must also satisfy a number of administrative requirements before commencing their projects. For example, because projects funded by the Program are "undertakings" within the meaning of the Historic Preservation Act, *see* 16 U.S.C. § 470f, the Park Service requires that grant recipients consult with their State Historic Preservation Officer prior to the receipt of funds. *See* 36 C.F.R. pt. 800 (2002); Guidelines at 2. In addition, grant recipients must agree to encumber the title to their property with a 50-year covenant, enforceable by the State Historic Preservation Office (or another entity designated by the Park Service), that runs with the land and provides that the owners "shall repair, maintain, and administer the premises so as to preserve the historical integrity of the features, materials, appearance, workmanship, and setting that made the property eligible for the National Register of Historic Places." Guidelines at 3. Finally, because Save America's Treasures grants are provided "only for the benefit of the public," "interior work (other than mechanical systems such as plumbing or wiring), or work not visible from the public way, must be open to the public at least 12 days a year during the 50-year term of the preservation easement or covenant." *Id*.

As further conditions of assistance, Save America's Treasures grantees must also keep detailed records of their expenditures and are subject to audit by the government to ensure that the Save America's Treasures grants are spent only for designated purposes. 16 U.S.C. § 470e. The Act expressly requires grantees to maintain "records which fully disclose the disposition by the beneficiary of the proceeds of such assistance, the total cost of the project or undertaking in connection with which such assistance is given or used, and the amount and nature of that

---

[4] The Program's appropriations legislation purports to require that "all projects to be funded shall be approved by the House and Senate Committees on Appropriations prior to the commitment of grant funds," Department of the Interior and Related Agencies Appropriations Act 2002, Pub. L. No. 107-63, 115 Stat. 414, 425 (2001), and the Program's guidelines state that a list of successful applicants is forwarded "to the House and Senate Committees on Appropriations for concurrence." Guidelines at 3. This provision, however, is unenforceable. *See INS v. Chadha*, 462 U.S. 919 (1983).

portion of the cost of the project or undertaking supplied by other sources, and such other records as will facilitate an effective audit." *Id*. In fulfillment of these requirements, the Secretary of the Interior requires that grant recipients sign agreements that obligate them to secure matching, non-federal funds; to seek reimbursement for incurred costs (grant funds are provided after the reimbursable expenditures have been incurred); and to submit to rigorous auditing and record-keeping requirements. Myers Letter at 3. These requirements ensure that grantees do not use federal funds for unauthorized purposes.

The guidelines that currently govern applications for Save America's Treasures grants expressly bar funding of "[h]istoric properties and collections associated with active religious organizations (for example, restoration of an historic church that is still actively used as a church)." Guidelines at 2. In contrast, the NHPA provides that "[g]rants may be made . . . for the preservation, stabilization, restoration, or rehabilitation of religious properties listed in the National Register of Historic Places, provided that the purpose of the grant is secular, does not promote religion, and seeks to protect those qualities that are historically significant." 16 U.S.C. § 470a(e)(4). Likewise, although current DOI regulations governing inclusion in the National Register provide that properties "owned by religious institutions or used for religious purposes" are "[o]rdinarily" deemed ineligible for the National Register, those regulations contain an exception for "religious property deriving primary significance from architectural or artistic distinction or historical importance." 36 C.F.R. § 60.4 ("*Criteria considerations*"). No such exception appears in the Program's guidelines. Thus, as the Program now stands, a religious property may be listed in the National Register or designated as a National Historic Landmark—and subjected to any regulatory requirements that may attend that designation[5]—but may not receive federal funding for preservation.

## B.

On April 3, 2002, the Old North Foundation ("Foundation") applied to the Park Service for a Save America's Treasures grant to preserve the Old North Church in Boston, Massachusetts.[6] The Old North Church is most famously associated with

---

[5] Although listing on the National Register does not itself trigger any federal regulatory restrictions, numerous states and local governments impose extensive restrictions on historic properties. *See, e.g.*, Daniel R. Mandelker, *Land Use Law* §§ 11.22–11.34 (3d ed. 1993); Christopher D. Bowers, *Historic Preservation Law Concerning Private Property*, 30 Urb. Law. 405, 409 (1998) ("Many historic preservation ordinances (or state law) require a person to obtain approval from either the local commission or the governing body of the city or county to alter a historic property, or the exterior of a structure on that property, or to place, construct, maintain, expand, or remove a structure on the property."); *see also Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 129 (1978) ("this Court has recognized, in a number of settings, that States and cities may enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city").

[6] The Foundation, a nonprofit corporation under section 501(c)(3) of the Internal Revenue Code, was established to develop educational programs that address "issues relating to freedom in the life of

Paul Revere's ride to warn colonists of the impending arrival of British troops on the eve of the Revolutionary War. Revere arranged for a signal to be sent by lanterns hung from the Old North Church's steeple—"One, if by land, and two, if by sea." On the night of April 18, 1775, the Church's sexton, Robert Newman, climbed the steeple and hung two lanterns, signaling to the Sons of Liberty and to Revere—then crossing the Charles River toward Charleston—that the British Regulars were moving up the River to Cambridge, from which they would later march on Lexington. On reaching Charleston, Revere raced by horseback across the Middlesex countryside to notify the colonists that the British were coming—summoning the Nation's first militia. The "shot heard 'round the world" was fired the following day, commencing the Revolutionary War. *See generally* National Register of Historic Places Inventory—Nomination Form, Part 8 (Statement of Significance); Henry Wadsworth Longfellow, *Paul Revere's Ride*, *in The Home Book of Verse* 2,422 (selected & arranged by Burton E. Stevenson, 9th ed. 1950). Recognizing the importance of these events, the Park Service has described the Old North Church as "an icon in American history," *see* http://www.nr.nps.gov/writeups/66000776.nl.pdf, and as "one of America's most cherished landmarks," both "[h]istorically and architecturally," *see* National Register of Historic Places Inventory—Nomination Form, Part 8 (Statement of Significance). The Church has been listed as a "religious facility" in the National Register of Historic Places since the Register's creation in 1966. It was designated as a National Historic Landmark in 1967. *See* http://tps.cr.nps.gov/nhl/detail.cfm?resourceId=585&resourceType=Building.

Construction of the Old North Church began in 1723 and was completed in 1745. Inspired by the design of Sir Christopher Wren's London churches, the Church was built in the Georgian style on a piece of pastureland near the crown of Copp's Hill, the highest elevation in the North End of Boston. *See* National Register of Historic Places Inventory—Nomination Form, Part 7 (Description); http://www.nr.nps.gov/writeups/66000776.nl.pdf (describing the Old North Church as "a superb example of colonial Georgian architecture"). The Old North Church was located close to the wharfs and warehouses of sea captains and merchants settling in the area. It contains the first maiden peal of church bells heard in North America, and its first guild of bell-ringers was formed in 1750 by Paul Revere, then a fifteen-year-old Congregationalist and founding member of the Church. *See* National Register of Historic Places Inventory—Nomination Form, Part 8 (Statement of Significance); http://www.oldnorth.com/guid.htm; http://www.nps.gov/bost/Old_North_Church.htm.

---

the nation," and in particular to "support the maintenance of Old North Church and its associated buildings as a symbol of freedom." Myers Letter at 3. It sought a grant award under the competitive program established by DOI's 2002 appropriations bill, which designated $30 million for historic preservation grants in fiscal year 2002. 115 Stat. at 425.

The Old North Church still contains the original window through which Robert Newman left the Church after hanging the lanterns on April 18, 1775. Although it was covered with brick in 1815, the window was rediscovered during restoration work in 1989. It now houses the Church's "Third Lantern," which was lit by President Ford on April 18, 1975, as a symbol of freedom and renewed resolve for the next century of the nation's life. Among other items of historical significance, the Church also houses the first bust of President George Washington; a plaque commemorating the 1736 visit of Charles Wesley, a preacher, hymn-writer, and co-founder of the Methodist Church; an 18th-century organ and two 18th-century chandeliers; a plaque commemorating the heroism of British Major John Pitcairn at the Battle of Bunker Hill; and the Bay Pew, which is decorated in a manner common during the early days of the Republic. *See* National Register of Historic Places Inventory—Nomination Form, Part 7 (Description); http://www.oldnorth. com/hist.htm.

The Old North Church also operates a museum and gift shop and is open to the general public for tours and other purposes from 9 a.m. to 5 p.m. daily. National Register of Historic Places Inventory—Nomination Form, Part 8 (Statement of Significance). For example, the Church offers school groups a basic tour that provides introductory background on the Church's involvement in the American Revolution. The Old North Church also offers a "Behind the Scenes" tour that provides a more in-depth view of the Church and its history, and "Paul Revere Tonight," a dramatic presentation that focuses on the relationship between Revere and the Church. The gift shop sells hundreds of books on these and related historical topics. According to the Park Service, visiting the Old North Church "bring[s] to life the American ideals of freedom of speech, religion, government, and self-determination." *See* http://www.nps.gov/bost/; *see also* http://www.oldnorth.com/ sginfo.htm#tours.

Although the Old North Church is open to the general public for many purposes, it also remains "an active Episcopal church" that is "a mission of the Episcopal Diocese of Massachusetts." *See* http://www.oldnorth.com; *see also* http://www. oldnorth.com/info.htm. The Church has approximately 150 members, and its programs and activities include adult education, choir, and various community outreaches. It holds two services on Sunday morning, worships according to the Book of Common Prayer, and administers Christian rites such as baptism. It has a dozen full- or part-time staff members. The bishop of the Diocese is the rector of the Old North Church, and he is represented by the vicar, who, acting for the bishop, oversees its activities and staff. *Id.*; *see also* National Register of Historic Places Inventory—Nomination Form, Part 8 (Statement of Significance).

The Old North Church is governed by the Corporation of Christ Church in the City of Boston. Its board includes nine members of the congregation, plus the vicar and the bishop, and meets monthly to oversee the operations of the church and the historic site. The Church's board is separate, however, from the board of

the Foundation, which comprises mostly non-church members and assists with the management of historic site programs and building preservation. *See* National Register of Historic Places Inventory—Nomination Form, Part 8 (Statement of Significance); http://www.oldnorth.com/info.htm.

The Foundation sought a grant from the Park Service to prevent deterioration of the structure, to repair the Old North Church's windows, to preserve the Church's early-18th- and 19th-century glass, and to restore natural ventilation to the building. The last significant maintenance of the Church's windows occurred in 1912, and the Foundation concluded that the building would lose its remaining historic glass and suffer water leakage absent timely restoration efforts. In addition, windows that were installed in the 1970s had a deleterious effect on the original windows, by trapping moisture and heat and leading to high building temperatures during summer months. The Foundation estimated that the proposed project, which was to be completed in accordance with the Secretary of the Interior's Standards for the Treatment of Historic Properties, *see* 36 C.F.R. pt. 68 (2002), would add a century or more to the expected life of the windows. Moreover, the ventilation improvements would improve the atmosphere for the numerous tourists who visit the Old North Church. Myers Letter at 3.

The Old North Church was one of 389 organizations that submitted applications for historic preservation grants in 2002. The Park Service reviewed its application and concluded that it was an "ideal candidate for a Save America's Treasures Grant, given its standing and importance in the history of America." Myers Letter at 3. On September 27, 2002, the Park Service informed the Foundation that its application had been accepted and that it would receive a grant of $317,000. Less than one month later, however, after requesting a revised budget and description of the scope of work from the Foundation, the Park Service notified the Foundation that it was withdrawing its award on the ground that the Old North Church is owned by a religious organization and used by an active religious congregation. *Id*. The Park Service based its reversal on the 1995 Opinion of this Office, which stated that "a court applying current precedent is most likely to conclude that the direct award of historic preservation grants to churches and other pervasively sectarian institutions violates the Establishment Clause." 19 Op. O.L.C. at 273.

## C.

The 1995 Opinion responded to an inquiry from then-Solicitor of the Department of the Interior John Leshy, who asked this Office to analyze the constitutionality of providing grants to preserve historic properties used for religious purposes. The opinion acknowledged that the question was a "very difficult one," that the line between permissible and impermissible assistance was "hard to discern," and that "the Supreme Court's jurisprudence in this area is still developing." 19 Op.

O.L.C. at 273. It concluded, however, that a reviewing court applying then-existing precedent would likely invalidate the provision of a historic preservation grant to a religious property that is actively used for worship. *Id*. at 267, 273.

The 1995 Opinion reasoned that a "two-part rule . . . govern[s] direct financial support of religious institutions." *Id*. at 268. First, it stated that direct aid may be given to "non-pervasively sectarian" religious institutions, provided the aid is not used to fund "specifically religious activity" and is "channeled exclusively to secular functions." *Id*. Second, it explained that there are institutions— "pervasively sectarian" institutions—"in which 'religion is so pervasive that a substantial portion of [their] functions are subsumed in the religious mission.'" *Id*. at 269 (quoting *Hunt v. McNair*, 413 U.S. 734, 743 (1973)). Because "most if not all active houses of worship" would qualify as "pervasively sectarian" institutions, in which the "secular and religious functions" are "inextricably intertwined," the government may not provide direct aid to them "with or without restrictions," because the aid will inevitably end up advancing religion. *Id*. In addition, the 1995 Opinion reasoned, to the extent that it is possible to distinguish between the religious and secular components of a church—the difficulty of which may be compounded by the relationship between architectural design and theological doctrine—any governmental effort "to identify those elements of a house of worship that do not have 'direct religious import' could well involve the kind of 'monitoring for the subtle or overt presence of religious matter' prohibited by the Establishment Clause." *Id*. at 270. In support of this reasoning, the 1995 Opinion cited Supreme Court decisions involving direct aid to religious organizations, and in particular *Tilton v. Richardson*, 403 U.S. 672 (1971), and *Committee for Public Education v. Nyquist*, 413 U.S. 756 (1973), which imposed certain restrictions on the government's provision of construction, maintenance, and repair aid to properties used by religious educational institutions.

The 1995 Opinion distinguished historic preservation grants from other sorts of benefits to religious institutions that have been sustained in recent decisions on the ground that the latter were "generally available to all interested parties, on a religion-neutral and near-automatic basis." 19 Op. O.L.C. at 271 (citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 840–45 (1995); *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 757–59, 763 (1995); *Westside Cmty. Bd. of Educ. v. Mergens*, 496 U.S. 226, 252 (1990)). As the opinion stated:

> Historic preservation grants, by contrast, do not appear to be generally available in the same sense. Properties, including religious properties, qualify for initial listing on the Historic Register only if they meet subjective criteria pertaining to architectural and artistic distinction and historical importance. Once listed, properties are eligible to compete for grants based on additional measures of "project wor-

thiness" established by the states. Participation by pervasively sectarian institutions in this kind of competitive grant program raises special concerns, absent in cases like *Rosenberger*, *Pinette*, and *Mergens*, that application of necessarily subjective criteria may require or reflect governmental judgments about the relative value of religious enterprises.

*Id*. at 271–72.

Since 1995, this Office has given advice that casts doubt on the continuing validity of the 1995 Opinion. Most important, in 2002 we opined that it was constitutional for the Federal Emergency Management Agency ("FEMA") to provide direct federal disaster assistance for the rebuilding of the Seattle Hebrew Academy, a religious school. *See Authority of FEMA to Provide Disaster Assistance to Seattle Hebrew Academy*, 26 Op. O.L.C. 114 (2002) ("2002 Opinion"). We explained that the aid at issue was made available on the basis of neutral criteria to a broad class of beneficiaries defined without reference to religion and including not only educational institutions but a host of other public and private institutions as well. We further reasoned that the FEMA program was amenable to neutral application, and that the evidence demonstrated that FEMA exercised its discretion in a neutral manner. Thus, we concluded that provision of disaster assistance to the Academy could not be materially distinguished from aid programs that are constitutional under longstanding Supreme Court precedents establishing that religious institutions are fully entitled to receive generally available government benefits and services, such as fire and police protection. *Id.* at 122–132.

In so ruling, we expressly noted that the 1995 Opinion "did not consider whether the rule of [*Tilton* and *Nyquist*] should apply where the grants at issue are available to a wide array of nonprofit institutions, rather than being limited to educational institutions." 2002 Opinion, 26 Op. O.L.C. at 127 n.13. "[T]o the extent that the [1995 Opinion] failed to consider the possibility that the rule of *Tilton* and *Nyquist* does not apply where direct aid is more generally available than was the aid in those cases," we observed, "it does not represent our current thinking, which is set forth in this Memorandum." *Id*. In addition, we explained, "significant portions" of the reasoning of *Tilton* and *Nyquist* are "subject to serious question in light of more recent decisions." *Id*. at 126 n.13. For example, we stated that "the 'pervasively sectarian' doctrine, which comprised the basis for many of the Court's Establishment Clause decisions in the early 1970s (including *Nyquist*, 413 U.S. at 774–75), no longer enjoys the support of a majority of the Court," which now requires proof of "*actual* diversion of public support to religious uses" and rejects "presumptions of religious indoctrination." *Id*.

## II.

You asked us to determine whether the NHPA's authorization of grants to historically significant religious properties is constitutional, and in particular whether the Establishment Clause poses a barrier to the Park Service's provision of Save America's Treasures grants to religious structures such as the Old North Church. There is no Supreme Court precedent that directly controls this specific issue. For three interrelated reasons, however, we conclude that the Establishment Clause does not pose a barrier to the Park Service's provision of such aid.[7]

*First*, the federal government has an obvious and powerful interest in preserving all sites of historic significance to the nation, without regard to their religious or secular character. The context in which this issue arises distinguishes the Program from programs of aid targeted to education, which have been subjected to especially rigorous scrutiny by the Supreme Court. *Second*, eligibility for historic preservation grants extends to a broad class of beneficiaries, defined without reference to religion and including both public and private institutions. All sorts of historic structures—from private homes to government buildings—are eligible for preservation grants. *Third*, although the criteria for funding require a measure of subjective judgment, those criteria are amenable to neutral application, and there is no basis to conclude that those who administer the Program will do so in a manner that favors religious institutions. Thus, we believe that the provision of historic preservation grants to religious structures such as the Old North Church cannot be materially distinguished from the provision of disaster assistance to religious schools, which we have already approved, or from other aid programs that are constitutional under longstanding precedents establishing that religious institutions are fully entitled to receive widely available government benefits and services. For similar reasons, no reasonable observer would view the Park Service's provision

---

[7] Under the general framework of *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), a law violates the Establishment Clause if it lacks a "secular legislative purpose," has a "primary effect" of advancing religion, or results in an "excessive entanglement" between government and religion. *See also Agostini v. Felton*, 521 U.S. 203, 232–35 (1997) (reformulating the *Lemon* test by incorporating its "entanglement" prong into its "effects" prong). As in most cases involving aid to religious institutions, the central question here is whether allowing religious structures such as the Old North Church to receive historic preservation assistance would advance religion (an "effects" inquiry), and we will focus primarily on cases that bear on that question. As for *Lemon*'s "purpose" prong, it is clear that allowing a range of historic religious and nonreligious structures to receive preservation grants serves the secular purpose of preserving our cultural heritage. *See* 16 U.S.C. § 470a(e)(4) ("[g]rants may be made . . . for the preservation, stabilization, restoration, or rehabilitation of religious properties listed in the National Register of Historic Places, provided that the purpose of the grant is secular, does not promote religion, and seeks to protect those qualities that are historically significant"). As for *Lemon*'s "entanglement" prong, there is no basis to conclude that allowing active religious structures to receive aid would "excessively entangle" church and state, since there is no more governmental monitoring of aid recipients here than in other cases in which the Court has not questioned the provision of aid under *Lemon*'s entanglement prong. *Cf., e.g.*, *Agostini*, 521 U.S. at 232–35; *Mitchell v. Helms*, 530 U.S. 793 (2000).

of a Save America's Treasures grant to an otherwise eligible religious structure as an endorsement of religion.

We explain below why these factors are sufficient to sustain the Program. If there were any remaining doubt as to its constitutionality, however, that doubt would be dispelled by the Program's numerous statutory and regulatory safeguards that ensure that federal funds are not used to advance religion. In particular, the Program contains rigorous auditing requirements to ensure that grants are spent only for authorized purposes related to historic preservation, not for the conduct of worship services. Although we do not believe that such restrictions are necessary in the context of a program involving aid made available to such a wide variety of public and private institutions, their existence further supports our conclusion that there is no constitutional infirmity here.

## A.

As an initial matter, we believe it is important to bear in mind the context in which this constitutional question has arisen. The Park Service has a substantial interest in facilitating the preservation of *all* sites of historic significance to the nation, without regard to their religious or secular character. This interest, moreover, distinguishes the grants here from programs of aid targeted to education, which the Supreme Court has subjected to far more rigorous scrutiny than aid to other sorts of religious institutions. *E.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987) (noting "particular [establishment] concerns that arise in the context of public elementary and secondary schools"); *Mitchell v. Helms*, 530 U.S. 793, 885 (2000) (Souter, J., dissenting) (noting that "two types of aid recipients heighten Establishment Clause concern: pervasively religious schools and primary and secondary religious schools"); *Nyquist*, 413 U.S. at 772. As explained in greater detail below, most of the Court's Establishment Clause decisions rendered since *Everson v. Board of Education*, 330 U.S. 1 (1947), have concerned aid provided solely to educational institutions as a class (in many cases, moreover, this aid was directed toward the educational process itself), and these decisions rest in part on the theory that aid directed solely to schools might reasonably be perceived as advancing the educational mission of those that receive it. *See, e.g.*, *Mitchell*, 530 U.S. at 843 (O'Connor, J., concurring in judgment). Given that a large percentage of private schools are religious, the Court has been sensitive to the possibility that direct funding solely of schools might amount to an attempt to fund religious indoctrination. The same cannot be said where, as here, a program is available to all manner of institutions. The aid at issue here is provided in return for the benefit of public access to a broad array of historically significant properties—some public, some private, some secular, some religious. Under the Court's precedents, such programs are not subjected to the special scrutiny reserved for programs of aid targeted to schools. *See Bowen v. Kendrick*, 487 U.S. 589, 613–18 (1988).

## B.

We regard it as especially significant that eligibility for historic preservation grants extends to a broad class of beneficiaries, defined without reference to religion and including both public and private institutions. Ever since 1947, the year of its first modern Establishment Clause decision in *Everson*, the Supreme Court has indicated that religious institutions are entitled to receive "general government services" made available on the basis of neutral criteria. 330 U.S. at 17. *Everson* held that the Establishment Clause does not bar students attending religious schools from receiving generally available school busing services provided by the government. In reaching its decision, the Court explained that even if the evenhanded provision of busing services increased the likelihood that some parents would send their children to religious schools, the same could be said of other "general state law benefits" that were even more clearly constitutional because they were equally available to all citizens and far removed from the religious function of the school. *Id*. at 16. As examples, the Court cited "such general government services as ordinary police and fire protection, connections for sewage disposal, public highways and sidewalks," concluding:

> cutting off church schools from these services, so separate and so indisputably marked off from the religious function, would make it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment. That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions, than it is to favor them.

*Id*. at 17–18. *See also id*. at 16 ("[The state] cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it*, from receiving the benefits of public welfare legislation. . . . [W]e must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its general state law benefits to all its citizens without regard to their religious belief.").

We believe that a Save America's Treasures grant is analogous to aid that qualifies as "general government services" approved by the Court in *Everson*. To be sure, such aid is not available to *all* citizens or buildings—and thus is not as broadly available as, say, utility services. But as we observed in the 2002 Opinion (26 Op. O.L.C. at 127), there is no principled reason why the constitutionality of an aid program should turn on whether the aid is provided to *all* citizens rather than, say, a wide array of organizations that falls somewhat short of the entire populace. There is a range of aid programs that are not as "general" as aid

provided universally, but yet are not as circumscribed as aid to education,[8] and Save America's Treasures grants admittedly fall within this middle ground. But such grants are not available only to educational institutions or, for that matter, to just a few classes of buildings. Rather, they are available to all kinds of private non-profit institutions, along with federal, state, local, and tribal governmental entities; and they may lawfully be used to rehabilitate *any* structure—be it a meeting house, a concert hall, a museum, a school, a house, a barn, a barracks, a government office building, or a church—that satisfies the generally applicable criteria for funding.[9] Accordingly, we think that the "'circumference'" of the Program can fairly be said to "'encircle[] a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter.'" *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 17 (1989) (plurality opinion) (quoting *Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 696 (1970) (Harlan, J.)). As the Court explained in *Widmar v. Vincent*, 454 U.S. 263, 274 (1981), "[t]he provision of benefits to so broad a spectrum of groups is an important index of secular effect." *Accord Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8 (1993) ("we have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge"); *Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 704 (1994) ("we have frequently relied explicitly on the general availability of any benefit provided religious groups or individuals in turning aside Establishment Clause challenges").

Put another way, the aid here is more closely analogous to the provision of "general" government aid like that sanctioned by the Court in *Everson* (and many times since, *see, e.g.*, *Nyquist*, 413 U.S. at 781–82) than to the construction grants at issue in *Tilton* and *Nyquist*, which were available only to schools. *See Nyquist*, 413 U.S. at 782 (distinguishing more general services from construction grants on the ground that general services are "provided in common to all citizens, are 'so separate and so indisputably marked off from the religious function,' that they may fairly be viewed as reflections of a neutral posture toward religious institutions" (citation omitted)); *cf.* Church Arson Prevention Act of 1996, Pub. L. No. 104-

---

[8] *See Mitchell*, 530 U.S. at 875 (Souter, J., dissenting) (stating that "government spending resists easy classification as between universal general service or subsidy of favoritism," and noting that *Everson* "turned on the inevitable question whether reimbursing all parents for the cost of transporting their children to school was close enough to police protection to tolerate its indirect benefit in some degree to religious schools").

[9] In this respect the Program here, viewed as a whole, is even less susceptible to religious favoritism than the FEMA program we recently considered. In the FEMA statutes, Congress made a value judgment that certain types of institutions—and only those institutions—should be eligible for federally funded rehabilitation assistance in the wake of a natural disaster. This judgment entailed a determination that certain institutions were especially worthy of support, and there was some risk (if remote) that Congress included private schools (most of which are religious) in order to channel support to religious education. There is no such risk here.

155, 110 Stat. 1392 (creating a program that provides low-income reconstruction loans to nonprofit organizations, including churches, destroyed by arson motivated by racial or religious animus). As Justice Brennan expressed the point in *Texas Monthly*: "Insofar as [a] subsidy is conferred upon a wide array of nonsectarian groups as well as religious organizations in pursuit of some legitimate secular end, the fact that religious groups benefit incidentally does not deprive the subsidy of the secular purpose and primary effect mandated by the Establishment Clause." 489 U.S. at 14–15 (plurality opinion) (footnote omitted).

*Walz v. Tax Commission*, 397 U.S. 664 (1970), strongly supports our conclusion. There the Court rejected an Establishment Clause challenge to a property tax exemption made available not only to churches, but to several other classes of nonprofit institutions, such as "hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups." *Id*. at 673; *see also id*. at 667 n.1. In upholding the tax exemption, the Court relied in part upon its breadth: the exemption did "not single[] out one particular church or religious group or even churches as such," but rather was available to "a broad class of property owned by nonprofit, quasi-public corporations." *Id*. at 673. As the Court stated in reference to *Everson*, if "buses can be provided to carry and policemen to protect church school pupils, we fail to see how a broader range of police and fire protection given equally to all churches, along with nonprofit hospitals, art galleries, and libraries receiving the same tax exemption, is different for purposes of the Religion Clauses." *Id*. at 671. Thus, just as a broad category of beneficiary institutions was sufficient to sustain the inclusion of religious institutions in the tax benefit in *Walz*—which, after all, substantially benefitted churches' *property*—we believe the breadth of eligibility for the Program here weighs heavily in favor of the constitutionality of a Save America's Treasures grant to the Old North Church.

The broad class of beneficiaries that are eligible for the Program here—including not only private non-profit groups, but state and local governmental units, Indian tribes, and numerous federal agencies, each of which may seek funding to preserve *any and all kinds* of historic structures—confirms that the Program's effect is not to advance religion. In contrast to the education-specific aid at issue in many of the foregoing cases, the historic preservation assistance provided by the Park Service serves goals entirely unrelated to inculcating religious values—namely, preservation of buildings that played an important role in our nation's history and that are (by virtue of their public or private nonprofit status) most in need of assistance. *Cf. Mitchell*, 530 U.S. at 883 (Souter, J., dissenting) ("[D]epending on the breadth of distribution, looking to evenhandedness is a way of asking whether a benefit can reasonably be seen to aid religion in fact; we do not regard the postal system as aiding religion, even though parochial schools get mail."). Indeed, although a number of churches can be expected to qualify for assistance under the Program, we do not expect that churches will

amount to a large percentage of grantees.[10] In recent years, structures preserved with funding provided by the Program include Revolutionary War barracks in Pennsylvania, a railroad complex in West Virginia, a Shaker village in New Hampshire, a courthouse in North Carolina, a theater in Massachusetts, a farmhouse and slave quarters in Maryland, a Frank Lloyd Wright home in Illinois, an art museum in Texas, a state capitol building in Nebraska, a hotel in Florida, a school in Utah, and a hospital in New York—to name just a few. The variety of structures that have been rehabilitated confirms the common sense notion that historical events happen in all sorts of places. There is no basis for concern that the Program will become a subterfuge designed to direct public money to churches, or to engage in any other sort of religious favoritism.

## C.

This brings us to the third consideration important to the Program's constitutionality: the neutrality of the criteria for selecting Save America's Treasures grantees. In the Program here, government officials must make a number of subjective judgments about a structure's cultural importance. Initially, they must determine whether a structure is "nationally significant"—e.g., whether it possesses "exceptional value or quality in illustrating or interpreting the intellectual and cultural heritage and the built environment of the United States," and whether it is associated with events, persons, ideas, or ideals that are significant in American history. Guidelines at 3. Moreover, they must conclude that the structure is "threatened," that the project has "educational, interpretive, or training value," and that the project has "a clear public benefit." *Id*. Insofar as reasonable people may disagree about whether a religious structure meets these criteria, there is some potential for favoritism of religion in their application.

As noted in the 2002 Opinion (26 Op. O.L.C. at 127 n.13), we believe that the degree to which officials administering public aid have discretion to favor (or disfavor) religious institutions—and, far more important, the manner in which they exercise that discretion—are relevant to the aid's constitutionality. Ever since *Everson*, the Court has made clear that one of the core purposes of the Establishment Clause is to prevent the government from favoring religion over non-religion, 330 U.S. at 16, and aid that is made available on the basis of discretionary criteria entails a greater risk of such favoritism than, say, aid made available on a

---

[10] We are not suggesting that an aid program has the unlawful effect of advancing religion merely because a large number of its beneficiaries are religious in nature. The Supreme Court has repeatedly repudiated the view that the percentage of a program's religious beneficiaries is relevant to its constitutionality under the Establishment Clause. *See, e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639, 658 (2002) (stating that "[t]he constitutionality of a neutral educational aid program simply does not turn on whether and why, in a particular area, at a particular time, most private schools are run by religious organizations"); *accord Agostini*, 521 U.S. at 229; *Mueller v. Allen*, 463 U.S. 388, 391, 401 (1983); *Mitchell*, 530 U.S. at 812 n.6 (plurality opinion).

per capita basis. For example, a program that authorized government officials to dole out aid solely on the basis of their assessment of what organizations' programs would best serve "the public interest" would entail a significant risk of favoritism.

Without more, however, the fact that an organization's eligibility for aid depends in part on satisfying subjective criteria is insufficient to invalidate the aid. Provided the criteria are amenable to neutral application, the program at issue is facially valid. *See generally United States v. Salerno*, 481 U.S. 739, 745 (1987) (a facial challenge will be sustained only if "no set of circumstances exists under which the Act would be valid"). As Judge Posner has explained: "[t]o exclude [a religious organization] from . . . competition [for government contracts or assistance] on the basis of a speculative fear that [government] officers might recommend [a] program because of their own . . . faith would involve the sacrifice of a real good to avoid a conjectured bad. It would be perverse if the Constitution required this result." *Freedom From Religion Found. v. McCallum*, 324 F.3d 880, 884 (7th Cir. 2003). Thus, while the exercise of religious favoritism in applying the eligibility criteria for a program would constitute an as-applied constitutional violation of the program, it would not invalidate the program on its face. *Id*. (explaining that the "danger" that determining eligibility for a program "would involve discretionary judgments possibly influenced by the religious preferences of the agency or public employees doing the rating" will not invalidate a program unless the danger has "materialized"). There is no reason to presume that, based on a neutral application of subjective criteria, religious institutions will never be qualified to receive aid.

Each of the eligibility criteria here is plainly amenable to neutral application. First, the criterion of "national significance"—which in turn depends on such factors as whether the structure has "exceptional value or quality in illustrating [the nation's] intellectual and cultural heritage," or whether it is associated with events or persons that are significant in American history—is predominantly a matter of architectural and historical significance. To be sure, there may be cases at the margins where the historians and other experts who assess applications for Save America's Treasures grants disagree about the importance of a building in our nation's history. But we understand that there are many more cases where there is little to no difference of opinion. It is hard to imagine anyone disputing, for example, that projects to preserve National Historic Landmarks such as Mount Vernon and Monticello are worthy of federal support on account of those homes' association with Presidents Washington and Jefferson. Similarly, there will be cases in which the experts will agree that a church holds a special place in our nation's history, whether because of its association with historic events (like the civil rights movement) or historic figures (like Paul Revere). Frank Lloyd Wright's Unity Temple in Oak Park, Illinois may have an active congregation and hold weekly worship services, but that does not diminish its significance as a

model of the Prairie School of architectural design or as a contribution to 20th-century American architecture generally. Nor do we think many would question the Park Service's conclusion that Old North Church is an "ideal candidate for a Save America's Treasures Grant, given its standing and importance in the history of America." Myers Letter at 3.

The second criterion that must be satisfied before an applicant may receive assistance—whether a structure is "threatened," "endangered," or otherwise has an "urgent preservation and/or conservation need" (Guidelines at 3)—is quite amenable to neutral application. Based on our review of the Guidelines and our discussions with DOI officials, we understand that Park Service officials make this assessment primarily on the basis of the physical condition of the structure and the financial resources available to the applicant. Such an inquiry is strictly secular and does not involve the government in an assessment of a structure's religious value. The same is true of the requirement that a project be "feasible." This requires only that the applicant be "able to . . . accomplis[h] [the project] within the proposed activities, schedule and budget described in the application," and to "match the Federal funds." *Id*.

The third main criterion for receiving assistance—whether the project has "educational, interpretive, or training value"—is somewhat more subjective, but the fact that a structure is used for religious purposes or closely associated with religious activities does not mean that its preservation lacks educational value, particularly when that value is based on its role in U.S. history. Among the thousands of items in its collection, the National Gallery of Art houses 581 works containing explicitly religious themes, including at least 107 works depicting the crucifixion of Jesus; 32 works depicting various prophetic figures such as Elijah and Jeremiah; and works such as Marc Chagall's "Jew with a Torah." *See* http://www.nga.gov/collection/srchsub.htm (subject search: religious); http://www.nga.gov/search/search.htm#artist (title search: crucifixion). Display of these works, many of which were created for specific religious institutions or events, may "advance" religion in the sense that exposure to any artistic work might influence the viewer. But the works are chosen on the basis of their artistic merit and historical significance, and they serve to educate the public regarding a certain genre of artistic expression or period in world history. Similarly, throughout our nation's history, religion and people of faith have influenced societal views on issues ranging from the abolition of slavery to women's suffrage to the justification for, and conduct of, war. The Supreme Court has long acknowledged that the study of religion, when presented neutrally as part of a secular program of public education (e.g., in history or literature classes), is fully consistent with the First Amendment. *Sch. Dist. of Abington v. Schempp*, 374 U.S. 203, 225 (1963). Public school libraries are therefore free to use public money to purchase works such as the Bible, the Koran, Chaim Potak's *The Chosen*, or John Milton's *Paradise Lost* for their stacks. Such works have religious themes, but they are also significant as

historical and literary works, and providing them for students to study has a secular educational purpose and effect. Likewise, we see no reason why providing federal funds to enable the public to visit a church where significant historical events occurred necessarily has any less educational value than funding the preservation of other sites that are significant in our nation's past.

The final criterion for obtaining assistance—whether funding the project would provide "a clear public benefit"—appears quite subjective at first glance. One could argue that it is impermissible for government officials to determine that society will receive a "clear public benefit" from the government's funding of the preservation of a church that is actively used for religious purposes. Without further guideposts to assist them in making this judgment, public officials might decide to favor particular religious structures (or religious structures in general) on the ground that the activities that take place in those structures are, in their opinion, beneficial to society at large. And one of the core purposes of the Religion Clauses is to disable the government from assessing the validity of religious truths or the value of religious activities. *See generally Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708–20 (1976); *Jones v. Wolf*, 443 U.S. 595, 602 (1979); *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714–16 (1981).

On closer examination, however, it is clear that the officials who administer Save America's Treasures grants do not determine a project's "clear public benefit" on the basis of subjective judgments about its religious value. Rather, a project that satisfies the other criteria for receiving a Save America's Treasures grant is deemed to provide a "clear public benefit" by virtue of being open to the public—whether "for visitation," "public viewing," or "scholarly research." Guidelines at 3. Thus, the Park Service's conclusion that the public will benefit from a project is not based on an assessment of the public value of the *religious* activities or character of the church, or for that matter of any of its *current* activities; it is based on the public value of being able to view, and learn from, the building and its place in our nation's history—on its accessibility to ordinary Americans. The conclusion that viewing the structure would be beneficial to the public derives from the structure's historical value, not its religious value. That is a valid, neutral basis for funding a project.

In summary, although the requirements that applicants must satisfy to obtain a Save America's Treasures grant are somewhat subjective, they are quite amenable to neutral application. This fact, together with the diverse makeup of structures that have been preserved under the Program, indicates that the Program is not "skewed towards religion." *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481, 488 (1986).

**D.**

For all these reasons, we also do not believe that a reasonable observer would perceive an endorsement of religion in the government's evenhanded provision of historic preservation assistance for maintenance of a church building that holds a significant place in our nation's history. *See Mitchell*, 530 U.S. at 842–44 (O'Connor, J., concurring in judgment).[11] In a direct aid program limited to a narrower class of recipients such as schools, one could argue that if a school "uses the aid to inculcate religion in its students, it is reasonable to say that the government has communicated a message of endorsement." *Id*. at 843. The notion is that, where the government provides education-specific aid, it is fair to say that the government is providing the assistance because of the content of the funded education. Such a presumption of governmental endorsement is not present, however, where the aid is provided to a wide array of public and private buildings because of historic events that once took place therein, and where the government is indifferent to the religious or secular orientation of the building. Moreover, we think a reasonable observer—one informed about the purpose, history, and breadth of the Program, *see Zelman v. Simmons-Harris*, 536 U.S. 639, 655 (2002)—would understand that the federal government is not paying for religious activity; it is paying to preserve a structure that played a role in our development as a nation, so that the public can visit it and learn about our heritage. That is not an endorsement of religion.

Similarly, our conclusion that the Park Service may provide historic preservation grants to structures such as the Old North Church is consistent with the underlying purposes of the Religion Clauses. They are designed to minimize, to the extent practicable, the government's influence over private decisions and matters involving religion, and the Supreme Court has repeatedly explained that governmental assistance must not be structured in a way that creates a financial incentive for people to change their religious (or nonreligious) behavior. *Zelman*, 536 U.S. at 653–54; *Agostini v. Felton*, 521 U.S. 203, 230–31 (1997); *Witters*, 474 U.S. at 487–88. Under the prior system, only structures used solely for nonreligious purposes were eligible for federal preservation grants. Churches with historically significant buildings had a powerful financial incentive to eliminate their religious programs and religious speech, effectively resigning themselves to the role of museums: unless they did so, they were ineligible for any assistance. Under the new rule, by contrast, churches have no incentive to bend their practices in a secular direction to receive aid.

---

[11] *See generally Cnty. of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 592 (1989) (the Court has, "[i]n recent years, . . . paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion"); *see also id.* at 624–32 (O'Connor, J., concurring in part and concurring in the judgment); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 307–08 (2000); *Agostini*, 521 U.S. at 235.

**E.**

Our conclusion regarding the constitutionality of providing historic preservation grants to religious structures such as the Old North Church is bolstered by the fact that the Program at issue has a number of requirements designed to ensure that the government funds only those aspects of preservation that produce a secular benefit. To begin with, under the NHPA, properties that are owned by religious institutions or used for religious purposes are eligible for Save America's Treasures grants only if they "deriv[e] primary significance from architectural or artistic distinction or historical importance," 36 C.F.R. § 60.4(a), and "[g]rants may be made . . . for the preservation, stabilization, restoration, or rehabilitation of religious properties listed in the National Register of Historic Places, *provided that the purpose of the grant is secular, does not promote religion, and seeks to protect those qualities that are historically significant*," 16 U.S.C. § 470a(e)(4) (emphasis added). Thus, the Park Service may provide grants for the preservation of religious structures only insofar as such preservation protects those structures' *historically significant* components.

Other aspects of the Program ensure that Save America's Treasures grants are provided "only for the benefit of the public," Guidelines at 3, by mandating that, for fifty years, grantees keep open to the public all portions of rehabilitated structures that are not visible from the public way. *Id*. at 2 (mandating that "interior work (other than mechanical systems such as plumbing or wiring), or work not visible from the public way, must be open to the public at least 12 days a year during the 50-year term of the preservation easement or covenant"). Furthermore, grant recipients must agree to encumber the title to their property with a 50-year covenant requiring that the owners "repair, maintain, and administer the premises so as to preserve the historical integrity of the features, materials, appearance, workmanship, and setting that made the property eligible for the National Register of Historic Places." *Id*. To ensure compliance with these requirements, Save America's Treasures grantees must keep detailed records of their expenditures and are subject to rigorous audit by the government to ensure that the Save America's Treasures grants are spent only for designated purposes. 16 U.S.C. § 470e (grantees must maintain "records which fully disclose the disposition by the beneficiary of the proceeds of such assistance, the total cost of the project or undertaking in connection with which such assistance is given or used, and the amount and nature of that portion of the cost of the project or undertaking supplied by other sources, and such other records as will facilitate an effective audit"); Myers Letter at 3.

These statutory and regulatory requirements make clear that Save America's Treasures grants may not be used to promote religion (16 U.S.C. § 470a(e)(4)); that they may be used only to preserve the historically significant portions of eligible properties (*id*.); and that rehabilitated portions of eligible structures must

be available for public viewing (Guidelines at 3). All of this is to say that the Program does not permit direct funding of religious activity. To be sure, one could argue that where a federal grant rehabilitates a building that is not only open for public tours, but also used for religious worship, the effect is ultimately to subsidize worship. But such a subsidy is indirect and remote, and that is not what the subsidy is for; rather, the subsidy is provided solely for the benefit to the public of being able to view a structure that played an important role in the history of the United States.[12] Accordingly, we think it is more reasonable to view the grant as akin to a "fee-for-services" transaction—in exchange for an easement that ensures 50 years of public access to the historic structure, the federal government pays a portion of the cost of preserving it.[13]

## III.

Some might contend that the Supreme Court's decisions in *Tilton* and *Nyquist*, which involved construction and maintenance aid to religious schools, should be read to support the conclusion that historic preservation grants to active churches would violate the Establishment Clause. For the reasons set forth below, we disagree.

---

[12] Although in some contexts "direct cash aid" might raise special concerns, *see Mitchell*, 530 U.S. at 856 (O'Connor, J., concurring in judgment), we note that the Save America's Treasures grant monies are not distributed until particular, reimbursable expenses have already been incurred by the grantee (*see* Myers Letter at 3), and that the rigorous auditing and record-keeping requirements discussed in the text ensure that the funds are used only for authorized purposes. Accordingly, there is no basis for concern that the money at issue will be diverted to non-Program purposes.

[13] The variety of other ways in which the Park Service might constitutionally provide assistance that would serve to rehabilitate a structure like the Old North Church confirms that there is no strict bar to the sort of assistance at issue here. For example, suppose that the Park Service negotiated a deal pursuant to which it paid the Church a fixed sum in exchange for an agreement to remain open to the public daily and free of charge. Such a fee-for-services transaction would directly "benefit" the Old North Church, and the Church might well exact a price from the government that would cover not only the cost of allowing public tours, but of maintaining the Church for use by its parishioners. But it would be clear that the Park Service was paying only for public access to a historic structure, and we do not think there is any serious question that such a program would be constitutional. Indeed, such a fee-for-services transaction would not be materially different from other sorts of transactions that the government routinely enters into with religious organizations—e.g., land trades, *see* H.R. 1113, 108th Cong. (2003) ("To authorize an exchange of land at Fort Frederica National Monument, and for other purposes")—where the religious organization has something of value that the government wishes to obtain. The case of Ebenezer Baptist Church, where Dr. Martin Luther King, Jr. preached a number of his most famous sermons on the subject of civil disobedience and race relations, is illustrative. We understand that the Park Service made a deal with that church whereby the church agreed to lease its historic building to the Park Service for 99 years, enabling the Park Service to conduct public tours of the church. In consideration for its rights as lessee, the Park Service provided the church with an adjacent parcel of land where the church has built a new sanctuary. Thus, the church has directly benefitted—by obtaining title to a valuable plot of real property—from providing public access to a church that is historically important as a window into the role of black churches in the civil rights movement.

In *Tilton*, the Court sustained the provision of federal construction grants to religious colleges insofar as the program at issue barred aid to facilities "'used for sectarian instruction or as a place for religious worship,'" but invalidated such grants insofar as the program permitted funding the construction of buildings that might someday be used for such activities. *See* 403 U.S. at 675, 683 (plurality opinion) (citations omitted). The Court concluded that a 20-year limitation on the statutory prohibition on the use of buildings for religious activities was insufficient because "[i]f, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion." *Id*. The Court therefore held that the religious use restriction had to run indefinitely. *Id*.

Similarly, *Nyquist* involved a program that provided maintenance and repair grants to religious elementary and secondary schools. The grants at issue were limited to 50 percent of the amount spent for comparable expenses in the public schools, but the Court invalidated the program. "No attempt [was] made to restrict payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes," the Court stated, and the 50 percent restriction would not necessarily prevent rehabilitation of entire religious schools. 413 U.S. at 774. The Court thus concluded that such aid would have the effect of advancing religion, in violation of *Lemon*'s second prong. *Id.*

These holdings, so far as they go, have not been expressly overruled, even where public aid is given to both religious and nonreligious schools on the basis of neutral criteria. *See Mitchell*, 530 U.S. at 856–57 (O'Connor, J., concurring in judgment). Thus, they might be thought to support a broader argument that providing historic preservation grants to restore a church building that is actively used for religious purposes would violate the Establishment Clause. Under this argument, insofar as a grant used to rehabilitate a church's building would ultimately support its use for secular *and* religious purposes—i.e., for both public tours and religious worship—such aid would be unlawful.

We are unable to adopt such a broad reading of *Tilton* and *Nyquist* for several reasons. First, as noted in the 2002 Opinion (26 Op. O.L.C. at 129), *Tilton* and *Nyquist* are in considerable tension with a more recent line of cases holding that the Free Speech Clause does not permit the government to deny religious groups equal access to *the government's own property*, even where such groups seek to use the property "'for purposes of religious worship or religious teaching.'" *Widmar v. Vincent*, 454 U.S. 263, 265 (1981). *See Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384, 394 (1993); *Capital Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995); *Good News Club v. Milford Central Sch.*, 533 U.S. 98 (2001); *see also Westside Cmty. Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990). Providing religious groups with access to property is a form of direct aid, and allowing such groups to conduct worship services plainly "advances" their religious mission. The Court, however, has consistently refused to *permit* (let

alone require) state officials to deny churches equal access to public school property on the basis of these officials' argument "that to permit its property to be used for religious purposes would be an establishment of religion." *Lamb's Chapel*, 508 U.S. at 394. Indeed, the Court has extended these cases to require equal *funding* of religious expression, reasoning that "[e]ven the provision of a meeting room . . . involve[s] governmental expenditure" for "upkeep, maintenance, and repair of the facilities." *See Rosenberger*, 515 U.S. at 842–43; *see also Prince ex rel. Prince v. Jacoby*, 303 F.3d 1074, 1085–86 (9th Cir. 2002) (extending the principles of *Rosenberger* to monetary and other benefits provided to student groups that are entitled to meet on school grounds under the Equal Access Act). Inasmuch as the Court has approved governmental expenditures for the maintenance and upkeep of facilities used for religious expression and worship, we decline to adopt a reading of *Tilton* and *Nyquist* that would create needless tension with later holdings. Indeed, insofar as the basis for treating a structure owned by a religious institution differently from a structure owned by a nonreligious institution is the religious *instruction* that takes place within its four walls—its *speech* and *viewpoint*—such discrimination directly implicates the Free Speech Clause. *See Rosenberger*, 515 U.S. at 828–31.

Furthermore, *Tilton* and *Nyquist* essentially sanction discrimination between private institutions that are identically situated but for their religious status—and in that respect are in tension with the Court's free exercise jurisprudence. The law in *Tilton* required colleges that applied for federal construction aid to provide 20 years of secular educational services in exchange for such assistance. Upon completion of their 20-year obligation, secular colleges that participated in the program were free to use buildings built with federal money for whatever purposes advanced their mission, regardless of whether such uses provided any benefit to the government. By contrast, religious colleges that earned the right to federal aid by providing the same 20 years of educational services—services that, again, were required by law to be secular—could not use a structure built with federal money to further *their* mission. In one sense, it could be argued that this was equal treatment, because neither religious nor secular colleges could use federal assistance for religious purposes. But it is more accurate to say that it was discrimination against institutions with religious worldviews: secular institutions were free to use government aid to foster their philosophical outlooks; religious institutions were not. The same can be said of the program at issue in *Nyquist*, under which secular private schools were free to use grants "given largely without restriction on usage" to advance their missions, but religious institutions were not. 413 U.S. at 774. Even after *Employment Division v. Smith*, 494 U.S. 872 (1990), such differential treatment is in considerable tension with the Free Exercise Clause. *See id.* at 877 (government may not "impose special disabilities on the basis of religious views or religious status"); *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532 (1993) ("[a]t a minimum, the protections of the Free

Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs"); *Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 390 (1990) (to "single out" religious activity "for special and burdensome treatment" would violate the Free Exercise Clause).[14]

Finally, the Supreme Court's Establishment Clause jurisprudence has greatly evolved since the Court's decisions in *Tilton* and *Nyquist* were rendered, and many of the legal principles that supported those decisions have been discarded. In 1985, for example, the Court struck down programs under which the government provided religious and other schools with teachers who offered remedial instruction to disadvantaged children. *See Aguilar v. Felton*, 473 U.S. 402 (1985); *Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373 (1985). The Court reasoned that teachers in the program might "become involved in intentionally or inadvertently inculcating particular religious tenets or beliefs." *Ball*, 473 U.S. at 385. In *Agostini*, however, the Court overruled *Aguilar* and substantial portions of *Ball*, explaining that the Court had abandoned the presumption that placing public employees in religious schools "inevitably results in the impermissible effect of state-sponsored indoctrination or constitutes a symbolic union between government and religion." 521 U.S. at 223. Similarly, in the 1970s the Court held that the state could not provide any "substantial aid to the educational function of [religious] schools," reasoning that such aid "necessarily results in aid to the sectarian school enterprise as a whole." *Meek v. Pittenger*, 421 U.S. 349, 366 (1975); *accord Wolman v. Walter*, 433 U.S. 229, 250 (1977). In *Agostini* and *Mitchell*, however, the Court expressly abandoned that view, overruling *Meek* and *Wolman*. *See Agostini*, 521 U.S. at 225; *Mitchell*, 530 U.S. at 808, 835–36 (plurality opinion); *id*. at 837, 851 (O'Connor, J., concurring in judgment). In addition, other portions of *Nyquist* have been substantially narrowed or overruled. As the Court stated in *Zelman*, "[t]o the extent the scope of *Nyquist* has remained an open question in light of these later decisions, we now hold that *Nyquist* does not govern neutral educational assistance programs that, like the program here, offer aid

---

[14] We are not suggesting that religion must always be treated the same as non-religion; that sort of formal neutrality has never commanded the support of the Supreme Court, and it would be inconsistent with the established principle that *the government* may not advance religion in ways that it is free to advance many secular ideals, *see, e.g.*, *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 337 (1987) ("For a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence"); *Santa Fe*, 530 U.S. at 302 ("there is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect" (quoting *Mergens*, 496 U.S. at 250 (plurality opinion))), as well as the principle that the government must sometimes accommodate religious practices in circumstances where it would not be required to accommodate similar secular practices, *see, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 216–17 (1972). But where the government treats *private* parties differently on the basis of their religious status or viewpoint, such differential treatment is subject to more rigorous scrutiny. *See, e.g.*, *Rosenberger*, 515 U.S. at 828–37; *McDaniel v. Paty*, 435 U.S. 618 (1978).

directly to a broad class of individual recipients defined without regard to religion." 536 U.S. at 662.

Perhaps more important, recent Supreme Court decisions have brought the demise of the "pervasively sectarian" doctrine that comprised the basis for numerous decisions from the 1970s, such as *Tilton* and *Nyquist*, and the 1995 Opinion of this Office. As noted above, that doctrine held that there are certain religious institutions in which religion is so pervasive that *no* government aid may be provided to them, because their performance of even "secular" tasks will be infused with religious purpose. That doctrine, however, no longer enjoys the support of a majority of the Court. Four Justices expressly abandoned it in *Mitchell*, *see* 530 U.S. at 825–29 (plurality opinion), and Justice O'Connor's opinion in that case set forth reasoning that is inconsistent with its underlying premises, *see id.* at 857–58 (O'Connor, J., concurring in judgment, joined by Breyer, J.) (requiring proof of *actual* diversion of public support to religious uses to invalidate direct aid to schools and explaining that "presumptions of religious indoctrination are normally inappropriate when evaluating neutral school-aid programs under the Establishment Clause"). *See also Columbia Union Coll. v. Oliver*, 254 F.3d 496, 502–04 (4th Cir. 2001) (explaining that the pervasively sectarian test is no longer valid in light of the holdings of six Justices in *Mitchell*). Justice O'Connor has rejected the view that aid provided to religious primary and secondary schools will invariably advance the schools' religious purposes, and that view is the foundation of the pervasively sectarian doctrine.

For all of these reasons, the reach of *Tilton* and *Nyquist* cannot be extended beyond their narrow holdings. And, for the reasons set forth in Part II, those holdings plainly do not control the question we address.

## IV.

For the foregoing reasons, we conclude that the Establishment Clause does not prevent the Department of the Interior from providing historic preservation grants to the Old North Church or to other active houses of worship that satisfy the generally applicable criteria for funding under the Program.

M. EDWARD WHELAN III
*Acting Assistant Attorney General*
*Office of Legal Counsel*